Welcome to the United States Court of Appeals to the Third Circuit. We're glad you're here with us today. Before we start, I'd like to welcome our two new colleagues to the court. Judges, we've got Jen Mascott over here who took her oath yesterday. So welcome to Judge Mascott and Judge Bovee who took his oath a few weeks ago. We look forward to working with you both for many years serving the people and the cause of justice. So welcome. Our case today as an en banc court is Association of New Jersey Rifle and Pistol Clubs Inc. et al. v. Attorney General of New Jersey, numbers 24-2415, 24-2450, and 24-2506. And we'll hear from the appellants first. Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of the ANJ RPC and Elman plaintiffs. If I may, I'm going to endeavor to save five minutes for rebuttal, which I'll be presenting that on behalf of all plaintiffs. That'd be great. Millions of law-abiding Americans own the semi-automatic rifles, pistols, and shotguns that New Jersey has prohibited, and millions more own the magazines that it has forbidden. That forecloses the state's effort to ban them as the Supreme Court has been emphatic that our historical tradition is one of protecting the right of the people to keep and bear arms that are in common use for lawful purposes today. The state's contrary arguments conflate Erin's distinct textual and historical tradition inquiries, distort the Second Amendment's plain text, and defy the Supreme Court's teaching in Heller and Bruin that what matters is what the people choose to keep and bear for self-defense and other lawful purposes, not what the government thinks they really need. If I can start with the threshold textual analysis that Bruin articulated. Bruin made quite clear that this is an analysis that focuses on the plain text. The Court used that term repeatedly and focused on the understanding of the words of the Second Amendment, as this Court put it in Laura, the normal and ordinary meaning of the Second Amendment's language. And the Court told us in Heller and again in Bruin what the normal and ordinary meaning of the term arms is. It's all instruments that constitute bearable arms, things that can be picked up and utilized for self-defense. If something can be used that way, then it is an arm for purposes of the threshold analysis. That doesn't mean it's ultimately covered by the Second Amendment, but it gets you past that gatekeeping function of simply asking, is the Second Amendment implicated in this case? And in this particular case, it's not a very complicated question to conclude that what we're talking about are arms in the ordinary meaning. What my clients and their members would like to keep and bear are firearms, rifles, pistols, shotguns, rifles, pistols, and shotguns equipped with ammunition feeding devices that are designed to enable them to operate as they're intended to function. The magazine is what enables a semi-automatic firearm to fire semi-automatically. So we're talking about firearms and their constituent components, which easily falls within the understanding of arms. That shifts the burden to the state to demonstrate that its law is consistent with historical tradition. And in this particular case, that's not a particularly complicated inquiry either, because here too, the Supreme Court has already spoken to what the historical tradition in this country is regarding bans on entire classes of firearms. The court held in Heller and reiterated in Bruin that the Second Amendment protects the possession and use of arms that are in common use today. And that teaches that that historical tradition is one that the court drew from the historical tradition of restrictions on dangerous and unusual weapons. Bruin reiterated repeatedly that it is drawn from historical tradition, not from the text. So it is the historical test. The test is if arms are commonly used, if they are what the people choose to use for lawful purposes like self-defense, then they cannot be flatly prohibited. They may be subject to other forms of regulation, but flat prohibitions are off the table. That was a necessary holding in Heller because Heller was, after all, an arms ban case. And again here, we don't think that that inquiry has applied to the facts of this particular law is particularly complicated, because what we're talking about are firearms, a class of firearms, modern sporting rifles, that are the second most common popular type of arms on the market today, after only the semi-automatic handguns that the court dealt with in Heller. There's a little bit less evidence regarding the numbers of the other firearms ban here, because the state has largely chosen to put forward essentially nothing to defend the application of this law to pistols and shotguns, but we put in evidence that those two are commonly used for self-defense, for hunting, for lawful purposes, and of course the magazines are account for roughly half the magazines in this country have a capacity of more than 10 rounds. So what you have here are arms that fit comfortably within the definition of arms that Heller and Bruin articulated, and arms that even if we may quibble around the edges about the precise numbers are by any measure commonly owned and used for lawful purposes including self-defense, and from our view that's the end of the inquiry. The state wants to shift the inquiry to focus on whether the state thinks people really need these particular arms or whether they'd be better suited with other types of arms that are available, but that is something that's an argument that was made and rejected in Heller when the court said it is no answer that the people can have long guns if constitution entitles them to have handguns. Here too it's not for the state to say we appreciate that you would like to have these particular arms for self-defense, but we don't think you're making making very reasonable decisions. I'd like to tease out your argument just a little bit. If as you suggest the common use inquiry falls at step two. If we agree that AR-15s and LCMs are in common use, is that the end of the inquiry? Do we even have a need to look at historical analogs? I don't think you, I think that is the end of the inquiry because common use is the historical test. So if I read Bruin and Heller, what the court said is we examined the history. We looked at the history to determine. The court had to look at that in Heller to determine what types of arms could be banned because Heller was an arms ban case, and the court looked at the tradition and said here is the tradition. We can see a tradition that allows for restrictions on arms that are both dangerous and unusual, but from that we draw the principle that if arms are not dangerous and unusual are instead in common use for lawful purposes, they're protected. And so it's not that we're saying there isn't a historical tradition inquiry here. It's just that the court happens to already have done it, and I think that if you do the historical tradition inquiry yourself and go look at the laws that the state's expert has put forward as well as our discussion of the historical laws, you can check the Supreme Court's work. I think they got it right because what you will find is that there are very few outright bans on carrying, let alone on keeping firearms. They are mostly restrictions on concealed carry, other types of things like enhanced penalties for using a particular arm in a crime, whatever it may be. I suspect my colleagues are going to have some questions for you. The district court's focus was on AR-15s. Where in the record would you direct us to your best evidence about the other weapons at issue? And if we agree with you on AR-15s, don't we still have to remand to consider the other assault rifles, the pistols, the shotguns? Is there anything that even tells us about the substantial identical or copycat ones here? Sure, absolutely. We put in evidence about that. I'd point you in particular to the declaration from Mr. Capelson that begins at JA-319, and we put in specific evidence. He talks about both. First, the discussion of rifles, if you look at 331 to 34 of the joint appendix, is not limited to ARs. It specifically talks about AKs as well and about mortars, sporting rifles more generally. I looked at Capelson and his specifics, yes, he says these are, but he doesn't talk about the prevalence of their use. He doesn't talk, you know, how many are in private hands. He doesn't talk about how people use them specifically. There's some generalities about them, but I don't, obviously we're on summary judgment de novo, but I don't know that we would feel comfortable ruling based just on the Capelson declaration. Sure, and I mean, we put in some of this, I think some of this legislative facts as well, and we discussed them in our opening brief. I think it's around pages 36, 37 that are specific to the rifles and pistols, but I would just say as a matter of burdens of proof here, you know, if you agree with our legal framework, it was the state's burden to prove that the rifles, that the pistols and shotguns, as well as the rifles, are not in common use today for lawful purposes. They're instead dangerous and unusual, and they basically chose not to make that case, even though I don't think they dispute that we were challenging, and I don't think you could dispute that we were always challenging all of these arms as evidenced by the fact that even if you don't think Mr. Capelson's declaration kind of has everything you're looking for, he's very clearly talking about all of the different firearms. We were always challenging them all, and the state has made a choice to really kind of largely ignore the pistols and shotguns, and so I don't think they really should get the benefit of their decision to not defend a significant part of their law, given that it is their burden of proof to demonstrate common use. Well, I mean, we think the record, you know, we think the record clearly shows common use on rifles, and on the rest of the law, I think we win as a matter of the state not meeting its burden of proof, and that doesn't mean, you know, a different state in a different case could try to put on evidence to justify. I think they end up having a tough time, because as the evidence we did put forward shows, these are, you know, we discussed in our brief how if you look at ATF numbers regarding arm braces, it suggests that we're somewhere in the neighborhood of eight million of the type of pistols that were prohibited here. The shotguns are very common for duck hunting and other lawful purposes, so I think they'd have a hard time showing that these are arms that are predominantly put to some sort of criminal use rather than owned by law-abiding citizens for lawful purposes, but as a matter of how the burdens of proof here operate, it is their burden. We think it is their burden, and you can't just show up and say, well, we're going to choose to not defend part of our law and then hope we get a do-over if we get to an en banc court. I think a lot of that comes from the English and NSSF reports, which are discussed in the declaration. The court below reached the conclusion that those are legislative facts that didn't need to be presented through direct evidence, so they are part of the declaration discussed in our statement of undisputed facts and the Chiefs and Plaintiffs' statements of undisputed facts, and those NSSF, and particularly the English report that was done by the Washington Post, it surveys people not just on ownership, but why they own the particular arms, what people say they put them to those particular uses. The NSSF report focuses on, in particular, on the commonality of modern sporting rifles and the uses to which people put them, and that report says that the second most common reason upwards of, people could list more than one reason, but about 80% of people said that home self-defense was one of the reasons that they own those types of arms and that they own the magazines that are in question. And picking up on your legislative questions, I assume you think the burden, the standard of review for that is de novo, when we're reviewing the district court's legislative factual findings? I mean, there's not any credibility determinations and such. I do think that you should take into account some degree of deference that the district court had a complete record, was able to look at the record, examine all that evidence. I mean, these cases were sent back down, so district courts would develop and examine records, so I think it makes sense to give some degree of deference to what the court was looking at. But at the end of the day, we do think that these cases are best understood as cases that turn principally on legislative facts, and that really, it'd be kind of odd for courts to be getting into elaborate factual findings about whether particular firearms are, especially in a court's view, well-suited for one purpose versus another, as opposed to simply focusing on that broader question of, are these the types of things that the people choose for lawful purposes? One last question for you to follow up on that, about the number of arms. Does the number matter relative to anything? That is, do we just, you know, is there just a number, and once you hit that number, if that is in common use, that's enough? Or do we compare it to the number of gun owners, the number of Americans? Like, how do we? Yeah, I don't think there's sort of a fixed, like, one and only one metric to look at. I think it's time for courts to look a little bit holistically at what are the numbers, how does this compare? I think you should focus on the universe of people who choose to own firearms, because it just kind of doesn't make a whole lot of sense to say, well, if the country has moved toward a direction where fewer people own firearms than might have originally, you don't want to have a situation where the changing views of the majority kind of eliminates the Second Amendment right that's protected in the Constitution. So I do think it makes sense to focus on gun owners. But I don't have a problem with the court looking both at the numbers and that, you know, I think it's relevant that not just that we have tens of millions of modern sporting rifles in circulation, but that they are the second most common weapon that's chosen by people who are purchasing firearms. Looking at that seems seems like a relevant data point to me in trying to assess that ultimate question of are these arms that the people are given given the choice are choosing as things that they think are suited for their self-defense and for lawful purposes. Yeah, there's common use a fixed point in time. In other words, if a firearm lost favor and it's no longer in common use, would that have any impact on the analysis? Yeah, so Bruin said that very specifically that common use is focused on today. It's the moment in time of the challenge because Bruin specifically dealt with an argument focusing on a 1690s handgun restriction. And the court ultimately said about that restriction, even assuming handguns were considered dangerous and unusual in 1690, they aren't today. And you couldn't rely on the way they were considered 400 years ago to try to justify a law today. I think if you're, you know, and I think that makes it pretty easy to comprehend as you're thinking about kind of moving forward in time as technology advances. If you think about that kind of from a moving backward perspective, I mean, I don't really have a problem with the notion that you could have firearms that as the technology advances, really become kind of obsolete. And that is the way the law has treated things. There are certain types of arms like a blunderbuss or such that at this point people can still own them as collector's items. And, you know, it'd be a tough thing to say we're going to actually confiscate them from you. But restrictions have come on the market that might not have existed at the time when no better technology was available. But today exists because we've hit a point where technology has advanced so much that people aren't really choosing them as something that they would think is suitable for their defense. Counsel, I have more of a threshold question as we're talking about all the facts and factors here that folks are looking at, making sure that we don't stray back into a form of the kind of intermediate scrutiny or balancing that existed prior to Bruin. So do you think that the Supreme Court's cases are best read as having kind of a strict bifurcated two-step test? Or does the history and tradition analysis kind of fold into the textual analysis at certain points, particularly when we're confident that the arms at stake are covered by the text? Yeah, so the way I think about it is less as sort of a strict two-part test and more as the first step is just a sort of threshold, almost like gut check of is this a law that implicates the Second Amendment in the same way that if you had a speech restriction, you know, you'd start by saying, well, does this even have anything to do with speech? Or are we talking about something that just no one would ever even think is speech? And then once you're past that, and once you can say, well, yeah, this is, you know, as Rahimi put it, this regulates arms bearing conduct, then you just move on to historical tradition. And I think one of the mistakes that some other courts have made is in thinking that they have to put, you know, bake into that threshold analysis, all of the, we have to determine the full historical scope of the right. That's what the second and the core part of the analysis is about. The first part is just saying, does this, what implicate the Second Amendment? Do we need to bother making the government justify what it's doing? As long as the law implicates the Second Amendment, you worry about understanding the full scope of the right and the full scope of the government's authority to regulate it in the core part of the analysis. And Mr. Fuhrman, when we look first at plain text, and you focus this on the term arms in isolation, but the court then went on to talk about keep and bear what that means. And in looking at the plain text of those terms put together, seem to be talking about which weapons are protected and the scope of the right, the kind of language, it sounds like it could possibly be defining what falls under the text. So as we're thinking about whether common use goes to step one and step two, I'd like to get your thoughts on how we should process context and historical context as we do for other terms in the Second Amendment. And for example, children are people. The French and British are people, if you look that up in the dictionary. But when we're looking at what the people means, we look to the historical context to define that as Americans. And so why shouldn't we do that when we're looking not at the plain text of arms in isolation, but the phrase in which it appears? Sure. I mean, I take the Supreme Court to be saying, you absolutely do all of that, but more as a matter of understanding it at the historical tradition phase, because when the court did plain text analysis in Bruin, what it focused on was not, you know, well, we need to understand the scope of the right to bear. The court at the textual, the threshold textual question simply looked at the text and said, the text doesn't draw a distinction between public and private carry. That didn't mean there might not be a distinction between public and private carry. The court then spent a very long time understanding contextually what it means to keep arms, what the protected right to carry arms was. But at that threshold question, they simply said, we don't see in the words that distinction, and we don't understand looking at dictionary definitions or a thesaurus or a secondary source, that people would understand the word keep to only apply to, sorry, the word bear to only apply to bearing in the home. And I think with people, it's a little bit different, because that is a term that in and of itself was used to refer to a particular group of people. So the ordinary understanding of the word people in the constitution has a narrower meaning, almost like a term of art meaning, you know, then people might be used colloquially. So I do think that then Haller looked very much at the idea of whether there was some sort of term of art meaning to the words and said there wasn't. And so I think you kind of kind of take the cue from the way the court has done the textual analysis in Haller and Bruin, that they're not saying that you don't need to ultimately assess contextually, what people understood the scope of the right to keep and bear arms to be, they're just saying you do that at the second part of the analysis when the government is coming forward and putting on its evidence of historical tradition, not at the front end. And I think that makes a lot of sense, because otherwise, you end up with a test where the Second Amendment is like even implicated until you've already determined that the Second Amendment has likely been violated. Turning to the discussion, sort of following up on the people, but more in the tradition and history and thinking about in common use. I think you had touched on the idea of the gun owners perspective, but looking at the tradition and history, it seems that dangerous and unusual and particularly, well actually both, but if you look at all the authorities cited in Haller, and all the authorities, those authorities cite, going back to the 1600s, it looks like the entire people, not just the owners, are the perspective that is referenced. So for instance, the essence of dangerous and unusual seems to be the terror of the people. So the, you know, there's a 1685 trial where they said at some point, swords stopped being a terror to the people, but they were a terror to the people when they were soldiers as opposed to pikesman instruments. And you see that through line all of these sources. But so terror to the people seems to be a key part of understanding whether they're in common use for a lawful purpose. Could you address that? Sure. I think if you go back and look at the cases that were dealing with terror of the people, what you'll find is that was actually a common law crime offense that was understood as intent-based. So you had to intend to be trying to terrorize the people. You can particularly see that in Huntley and the name is now escaping me of the case from back in, you know, the British case back in the 1600s that said it's about malum intent. And so I don't think that the terror of the people test, when I saw that, that was, that seemed to be either place-based or actually going armed. But when it came to whether something is dangerous and unusual, which is what I was trying to drill down on, what is the meaning of dangerous and unusual from the through line, from the second amendment back and forward, it seems to be defined by not just the owners, certainly by the owners, but also by the entire people because of that terror to the people. I mean, there were multiple ways to violate going armed. One was sensitive places. One was, you know, menaces or with words accompanying, but there also seemed to be as far as what constitutes dangerous and unusual, it seemed to be largely defined by unusual as perceived by the people and to their terror. Yeah, you know, I have to disagree. I don't really see a through line of kind of like a heckler's veto of, you know, we're all a little bit afraid of the arms that some people like to carry and so you can't carry them. I think what you see is more a through line of that, you know, are you carrying for an improper purpose with malintent? Are you carrying, there's certainly a sensitive places doctrine about, you know, where are you carrying in a place that traditionally has been one where we worry about the carrying. If it's malintent, I get what you're saying. I've definitely seen those cases. I guess what I'm wondering, if it's malintent, then why are they called dangerous and unusual if it's all about intent? Sure, and that's why I think the dangerous and unusual, it draws from a lot of different pieces. You know, I mean, there's the notion of those laws that were about carrying in a way that, you know, had malintent, but they're focused on particular weapons that were understood as ones that, you know, nobody's typically carrying. And it may be that carrying that particular type of weapon is going to be something that you sort of assume ill intent from. But as Bruin discussed, if you're kind of carrying like ordinary weapons, and the Huntley case in particular from North Carolina makes, if you're something, you can't kind of assume the malintent from carrying the types of things that people ordinarily have and keep. And so once again, it comes down to straight numbers. I think it comes down, and the inquiry that courts are trying to focus on is getting an understanding of, is this something that falls into the category of the types of things that ordinary people choose to have for lawful purposes? Or is it something that's really predominantly or exclusively used for unlawful purposes? And I think Judge Nobandian's just concurring opinion in the Bridges case in the Sixth Circuit, has a helpful discussion going through also the 1800s decisions from state courts. And as he walks through them, he demonstrates, he's like, you know, I'm not here to tell you they necessarily had the facts on the ground right about everything. But the through line through those cases, is that they can keep focusing on that question of, is this the type of arm that we understand ordinary people are actually keeping and using for lawful purposes? Or is it something that really seems to only be being used, principally in criminal ways? And I think that's really key, because of course, any arm can be used in criminal ways. And most arms are used by some people in criminal ways. I mean, power was decided on the undisputed premise that the handgun is the weapon of choice of criminals. But if you so if you focus on it through that lens of can it be used for criminal purposes, nothing's ever going to be protected. And I think that's why the court has instead, the through line through not just the Supreme Court, but if you look at historical cases is to say, no, no, no, we have to, since this is a right of the law abiding people, we need to keep the focus on what do law abiding people choose? What did they decide are the things that are best suited for their self defense for hunting for whatever their lawful purposes? What will be for you seeking under the takings claim? Is it just injunctive? Or is there a compensatory element as well? So, you know, just to be clear, obviously, you only reach the takings claim if you were to disagree with us on the first piece of the case. But I think the best remedy on the taking piece would simply to be to invalidate the law and join it as to retrospective application. Because if you just think of this through sort of severability analysis, I don't think the New Jersey legislature had any intention or understanding of the notion that it might have to pay just compensation on the retroactive application of the ban. And so I think the fairest thing to do would be to tell the legislature, look, if you're going to require people to modify or get rid of their property, you are going to have to pay just compensation. And we'll let you make the choice whether you want to remedy that by having a law that no longer applies retrospectively. The law was you have to give over your property. I mean, it seems a natural. I mean, they should have thought that there's kind of no indication that they did. And so I think that's something that indicates that the legislature actually focused on this and thought, you know, hey, we might have to pay compensation, that it would seem to be kind of fair to the sovereign to let them make the choice whether they think they whether they want how they want to remedy the constitutional problem. I think you could identify the problem, say this can't apply retrospectively unless you are willing to pay just compensation. And it's sort of up to you which way you want to go with that. I frankly don't know which way legislature would want to go with that. But I think that would kind of make more sense then. But, you know, you certainly could say everybody now we're going to go litigate just compensation and they could choose to repeal the law retrospectively if they don't want to have to do that. Let me ask Judge Smith. Can you hear us? I can hear you now. You don't have to look at me. Do you have any questions? I do not. Thank you, Chief Judge. OK, great. We'll hear you on rebuttal. Thank you. Thank you. Now, you don't have uninterrupted time, so we can dig right in. Exactly. Yes. Good morning. OK, go ahead. I was going to introduce myself. Good morning, Your Honor. I'm Pete Patterson. To follow up on some of my colleagues' questions, if we use the sort of numerical or popularity approach that you talk about, what circulation number actually does constitute common use? I mean, we have to write an opinion. Of course, we'll have to follow our opinion. Right. Exactly. And I think there's a circulation number that is sufficient but not necessary to demonstrate protection. And to take a step back, it's the state's burden to show that these are dangerous and unusual weapons. And our submission would be if there are millions of Americans, law-abiding Americans, that own something, that that simply cannot be the case. They can't make that showing. But it doesn't have to be millions. And I think this court is bound not only in method but in result by Staples and Smith and Wesson. And what the court said in those cases about the very firearms at issues here is that they're generally available, commonplace, and traditionally lawful. That's what the court said in Staples. And then Smith and Wesson, it said they're widely legal and purchased by many ordinary Americans. And so we were a number, though, counsel. I mean, are there guardrails here? Yes. I think once you get into if something is in the hundreds of thousands and it is generally legal and commonplace across the country, that is not a dangerous and unusual weapon. As Judge Patterson said, if something was dangerous and unusual, many states would rush to regulate it. It's not that we say the states get to dictate. But if the American people truly deem something dangerous and unusual, it would not be the case that hundreds of thousands of Americans would own it and it would just be left unregulated. Mr. Patterson, I think there are 176,000 machine guns out there. So I'm a little concerned about a test that gets to 100,000 unless we have a machine gun. You don't appear to be challenging bump stocks. I presume you wouldn't challenge bans on conversion kits, maybe force triggers, some other things that duplicate machine guns. So if we're going to just different, if we ruled for you, would we be on a slippery slope to saying machine guns have to be allowed as well? Or could we use some of the qualitative aspects of machine guns to talk about why they're not suited for lawful purposes? We would not. I don't know if it would necessarily be qualitative. But the reason why is, again, it's not something that's in the millions. What I said, if we're in the millions, numbers alone. If we're in lower numbers, the question is, ultimately, the question is here, do the American people consider this a dangerous, unusual weapon? And if there is any weapon of a firearm type that the American people do under the Supreme Court's test that you could potentially say that about, it would be machine guns. When they came on the market, nobody bought them except for criminals. They were quickly regulated, prohibitive regulations at federal level. Because of the rate of fire, the kick, the resulting inaccuracy. Well, okay. So that gets to the dangerous part. It's dangerous and unusual. The first thing I was talking about was unusual. This would go to danger would be that they are inaccurate. They're hard to control. That is a traditional reason why an arm has been restricted in this country is because of potential indiscriminate fire. Even if we look at the trap gun regulations that New Jersey talks about, the issue with that is people would be using lethal force in a situation where it was not called for. It was indiscriminate. Same thing if you think of an incendiary device or people raise hypotheticals like nuclear weapons. Those are indiscriminate. And that is backwards from what we have here, where the features that New Jersey focuses on make an arm more accurate. And so accuracy has never been a reason to consider an arm dangerous and unusual. But to get back to the test, what you would say about machine guns is, and what I think Staples said, these have not traditionally been regarded as lawful possessions. These are items that the American people have determined should be set aside for a special use or special purpose, not for common use. Versus something like stun guns, which Justice Alito said there are 200,000 of them, and they are protected on that basis. It wasn't on the numbers alone. It said there were 200,000, and they're legal in 45 states. And so these are not something that the American people have determined are special or unusual or particularly dangerous. What do we do about magazines? Because your case involves the magazines too. You have the Capitalism Declaration that says there might be 100 million 30-round magazines out there. But Capitalism also says fives, tens, and forties are relatively rare. This is a facial challenge. Does the fact that the ban might be lawfully applied to magazines of more than 30 rounds mean that you lose or that we need something crafted more narrowly? Because you're challenging this facially, but there's evidence that seems to dispute that magazines over 30 are not in common use. Well, we actually do not, but I can answer that question. I think no, Your Honor, because the element of the offense is that it's larger than 10. So it would not be a constitutional application of that statute to apply it even to something that was larger than whatever was the common number. And if we look at Heller, it's struck down facially, D.C.'s ban on handguns, even while acknowledging if it was an automatic handgun, that could be banned. But that wouldn't be a constitutional application of D.C.'s law because the element that you would have to prove would only be that it's a handgun. Similarly here, the only element you would have to prove is that it is greater than 10, and that is not constitutional in any application. Where do we draw the line on that? We draw the line at the standard Glock, which I think the most common Glocks I think are 17 and 19. Is that right? I think, again, we don't have a magazine claim in this case, but my understanding is that at least up to 30 is in common use. And then you would also have to ask, okay, is it particularly dangerous? And I don't know if just simple capacity, standing alone, would make something particularly dangerous. My understanding is that once you get above 30 to really large magazines, there's enhanced likelihood of malfunctions and things like that. So that could be something that could- But your argument is we don't need to go there because more than 11 is where the line- More than 11, that's the line in New Jersey- 11 or more. Yes, that they drew, and that's the element that the state has to prove, and that is unconstitutional in all applications. Maybe they could write a law that said you have to prove it's more than 30 or whatever the number is, and that would be a different analysis. Mr. Patterson, could you put a clarification? Because both you and Ms. Murphy have been talking about this as a categorical ban on assault firearms, but the prohibition has a carve-out for persons who are licensed, registered, or where the firearm is rendered inoperable. Why isn't this properly considered a license and registration scheme rather than a ban? Well, because the license is limited to those who can show that the public safety requires that they possess one of these things, and the evidence indicates that maybe no normal citizen of New Jersey has ever gotten this. So this would be May issue Bruin on steroids. We have Bruin in the pictures. Why should we assume that the New Jersey courts wouldn't interpret that licensing provision consistent with Supreme Court precedent? Well, the licensing provision itself on its face, I think it's 58-5B, if I'm correct, says that the public safety requires that this license be issued, and also there is no history of registration in this country. Justice Kavanaugh in his Heller 2 dissent made very clear that there's no history of registration in this country, so that would be unconstitutional. So the scheme would not be unconstitutional even if you took out that requirement. Does that mean that this case applied for a license? No, the argument has been that would be futile. New Jersey has not disputed that. So again, under the plain terms of the statute, they would not be eligible. And what do we do with the registration provision that seems to provide that the attorney general should compile a list of assault firearms used in competitive shooting, and specifically it should include in that list the Colt AR-15, and then provide that owners of such firearms purchased before 1990 are legitimate for target shooting purposes if registered? Well, again, there's no history of registration in this country. That would be unconstitutional. Approaches before 1990 doesn't help my clients, and I think another provision you mentioned, and also only used for target shooting doesn't help because these are wanting to be used for self-defense. And so a state can't say an arm that is in common use, including for self-defense, can only be used for non-self-defense purpose. I'm surprised you said no history of registration when we have the footnote nine in Bruins seems to say shell issue schemes can require people to jump through these hoops of passing background checks, firearm safety courses, et cetera, that have narrow objective and definite standards. Well, yes, and then in Heller 2 descent addressing the assault weapons issue, and a different part of that, Justice Kavanaugh, then Judge Kavanaugh, addressed licensing and registration. And he said licensing is one thing. It's to determine whether the person is the type of person who has not forfeited the right versus registration is an entirely different thing. It's not serving the purpose of screening whether this person is disqualified. It's instead tracking who owns arms and is seen, Justice Kavanaugh said, as a half a loaf measure toward confiscation of arms because that's what it facilitates. So you could imagine if the British leading up to the revolution had said, colonists, everyone has to register their arms, you can be sure that would not have been met without opposition. Anything else for you? No? Oh, okay. Judge Smith, do you have anything you'd like to ask? Again, no. Thank you. Okay. Thank you. Thank you. May it please the court. Jeremy Feigenbaum for New Jersey. The people of 15 states representing almost 40% of the US population restrict assault weapons or LCMs just as the federal government did for 10 years. States have done so in response to the modern crisis of mass shootings on our screens, in our concert halls and at our schools. Mass shootings that have been facilitated by widespread modern access to assault weapons and LCMs and the fearsome firepower they unleash. Since the Supreme Court decided Bruin, all six circuits to consider the validity of assault and to the chief judge's question, finding that circulation alone cannot be the exclusive test, but instead doing exhaustive historical inquiries themselves. And all six circuits, based on those historical inquiries, have found that these laws fall well within the principles that underlie our nation's tradition. This court, including in en banc cases like Riccio, has long expressed a reluctance to split with the unanimous views of its sister circuits, and there is no compelling reason to do so here. I'll start with where this morning's colloquies began, and in particular the chief judge's question with why this court should not adopt plaintiff's popularity only test. Plaintiff's approach, where the state loses its ability to prohibit an item that has become too popular, no matter how extreme its danger, and no matter how much history the state has on its side, fails for five reasons. First, as the colloquies this morning have confirmed, a popularity only test is fundamentally ahistorical. The record shows that American legislatures often acted after a weapon had circulated and its danger had become clear, with nearly every state, for example, restricting bowie knives after there had been a craze for them across the country. This morning, plaintiffs repeatedly respond, including to Judge Chung's question, with the idea that the historical tradition is about dangerous and unusual, and they really stress that and unusual. But as the second circuit and the opinion by Judge Walker shows in detail, the actual historical record and the Supreme Court's own cases, including in Rahimi, also have at least as many references to dangerous or unusual, suggesting that this isn't a mandatory two-prong test. Second, as the colloquies with both the chief and Judge Vebas showed this morning, plaintiff's test would indeed produce inviolable protection for machine guns. There are, as Judge Vebas noted, at least 176,000 machine guns in civilian circulation, a number that would be even higher but for the National Firearms Act. And by 2018, there were already 520,000 bump stocks in civilian circulation as well. There's no argument that those are collector's items, and instead that shows that there is a durable group of Americans who want access to automatic fire. My friends on the other side today suggest that if there is a number to be drawn somewhere, it's probably in the hundreds of thousands, but that sweeps in machine guns and that sweeps in bump stocks, which they rush to say doesn't fall in on their test. And so in this morning's colloquies with Judge Vebas and with the chief, they specifically say, well, maybe in reality it also matters if the item is generally legal. That has two problems. Maybe that's helpful with machine guns, although I'll return to that, but it's definitely not helpful with bump stocks, which as we all know are not prohibited federally. We have about 15 state assault weapon and LCM laws. There are about 17 state bump stock laws. So if we're really going to say hundreds of thousands are enough, so long as it's generally legal and not mostly banned across the state, then we've walked our way right into constitutional protection for bump stocks too. Instead, Judge Vebas was repeatedly encouraging counsel to note maybe there should be qualitative aspects of the item that get baked in as well. And my friends on the other side resisted that because they have to resist that because their own explanation has to push out the objective features of the item. Because if you look at the objective features of the item, then every circuit that's done exactly that, all six to date, recognize that the objective features of the AR-15 look just like the objective features of the M-16, but for automatic fire and at the large capacity magazine is likewise unusually dangerous. And so when the bridge is majority, leave aside the concurrence for a moment, when the bridge is majority from the Sixth Circuit that my friends on the other side highlighted to the support in a 28-J letter, tries to do a dangerous and unusual analysis in exactly this way for machine guns, it starts with numbers. It recognizes that the numbers are similar for tasers and for stun guns as they are for bump stocks and machine guns. And so they themselves fall back as they did in the last two paragraphs inciting Bianchi and the Fourth Circuit's own test for unusually dangerous. And that gets to my final point before it's time to welcome this court's questions, which is that there's always been a separate tradition where states can regulate unusually dangerous weapons. That is weapons presenting a disproportionate contribution to a serious public safety threat while leaving open myriad other avenues for self-defense. And I welcome this court's questions. Thank you, counsel. I'm going to stick with with common use again. We see your brief talks a lot about self-defense. In a common use inquiry, is self-defense the only lawful purpose that we should be looking at? What about the hunting, target shooting, or other lawful uses mentioned by your friends across the aisle? So I'd like to show them a question and then say why I don't think it matters to this case. But let me join issue. I do think that the only purpose that matters is self-defense. If this court looks at Bruin and Rahimi, especially in the way Bruin structures the analogical reasoning, it says that when you look at modern laws and you compare them to historical laws, you look at the how and why the modern laws and historical laws burden self-defense. And if the Second Amendment right at the first step was supposed to be about hunting or common defense or collection or whatever have you, it would be very weird for Bruin then to have set up an analogical reasoning at the second step. How do you compare that with Heller that three times mentioned tyranny and the importance of a citizen militia being a bulwark against tyranny? And also in your brief at page 29, you I think tacitly acknowledge other rationales when you say that the individual self-defense is the central component of the Second Amendment right as originally understood. If self-defense is the central component, clearly there are other components. And is not one of those other components precisely what Justice Scalia wrote in his opinion in Heller? So two thoughts on that. Maybe I'll take the common defense, the resisting tyranny, and then the broader question, Judge Hardiman. So on the first point, we deal with this most directly in our response to the United States, but I think it has two problems of precedent and one problem of history. The historical problem is that at the time of the items you would use for individual self-defense and the items you would use in militia service were one and the same. And so you could have in the militia what you could have at home to defend yourself. As the gap grew, it doesn't mean that the converse is true. That just because you could have something in a military setting means that you can necessarily have it at home as well in times of peace. And we know that has to be true. And my friends don't even really fight this principle because if you took the arguments... Sorry, let me just interrupt and then I'll let you finish. You said military setting. What do you mean by that? Is that equivalent to citizen militia or standing army? So I don't think they're exactly identical, and I think that's a totally fair point. What I will say is if we're using the language from Miller, baking it through to Heller and using the prefatory clause to bake the substantive meaning of the right, and I will get back to why we shouldn't do that in a moment, then I do think we run right back into the machine gun problem. Because what the United States says in its common defense resisting tyranny theory is that you want to keep in times of peace in your home and practice with the things you would use in times of war. Well, what do we use in times of war in the 21st century? They say we use automatic fire. And so I don't know why we would cover that link. I think you've just articulated an excellent original public meaning argument, but we write on precedent and Supreme Court precedents are pretty clear that machine guns are out. Yeah, but I think that has to make sense. I mean, I don't think that what the Supreme Court was doing was announcing a test that leads to protection for machine guns, and then announcing that machine guns are nevertheless out. So I don't think it's so easy to just say Heller says machine guns are out, and then we adopt a test that doesn't take that into account. I think that's not normally how this Court does constitutional law, and I think it'd be quite weird to do that in the Second Amendment where the precedent tells you to look at a very originalist framework. Don't we lose a lot of time with Heller? Heller, by its rationale, would have covered all kinds of things, but were carved out like felons or sensitive places. So why can't we do that with machine guns? Well, this Court in range obviously didn't think the mere fact that someone was a felon ended the inquiry. So I don't think this Court has taken Heller and those sentences to be irrespective of constitutional law. And our submission here is in the years after range, this Court has been looking repeatedly at whether individuals pose some sort of unusual danger, because that is at least part of the tradition this Court recognizes. And we think you can do the same for unusually dangerous items based on the same historical evidence. Can you trace the unusually dangerous language to any of the Supreme Court's cases? So I think we can in the sense that they are repeatedly citing not just dangerous and unusual, but also dangerous or unusual. Now, I don't want a world of dangerous or unusual, because then we could just ban everything before it got popular. Dangerous and unusual, or dangerous or unusual, the same thing as unusually dangerous. I think the fact that both exist in the opinion suggest the answer is yes, because it would be very weird to have a test that means a mandatory two-prong analysis in all cases, where sometimes the Court says and, and sometimes the Court says or. It's just not the way normally we would think the Supreme Court or this Court, frankly, would say, like, if I'm going to eat breakfast and lunch, or I'm going to eat breakfast or lunch, you wouldn't think I've set up a always have to be met. I think this gets back to a question the Chief asked earlier, which is, is common use the only thing that we care about here? And the only support my friends on the other side have for the idea that this is all we care about in this case, is this and unusual phrase, which again, Heller and Rahimi also use or unusual, the original sources also use or unusual. And over and over, we see a rejection of the idea that we would have two prongs. The Supreme Court actually said the only items that get protection are those in common use. But if I say that Judge Hardiman only hears cases on the Third Circuit, I'm suggesting he doesn't hear cases on the Ninth Circuit. I'm not suggesting she hears every single panel case in the Third Circuit. It's like an LSAT problem. It's saying that something is an only doesn't mean it's an every. And so it's true. Only items in common use may get protection. This is Bruin at 32, but it doesn't mean you put on blinders and ignore the entire rest of the historical tradition from England to dangerous or unusual treatises, to Bowie knives, to slung shots, to 20th century machine gun laws. So we have a tradition. Thank you. I heard your opening statement to focus a lot on the history and tradition dealing with the type of weapon to be regulated. Do you read the precedents also require there to be a history and tradition of the particular type of state law or restriction and its severity? And is that relevant? Yeah. So I think there's maybe two questions there, if I could disaggregate them for a second. So the first is, how does this discuss your earlier question with what's in the text stage, what's in the history stage, and then the second is what kind of history matters. On the text versus history question that I know you asked, my friend, I found Ms. Murphy's answer sort of curious that the First Amendment would be a good place to look because actually we know certain kinds of speech does fall out, even though it's literally speech, like child pornography. We don't subject child pornography laws to means and scrutiny because it falls outside the scope of the right based on the original public meaning. So we do think there's always original public meaning evidence, even when you're interpreting text. Justice Barrett herself has said many times in figuring out the normal and ordinary words in the constitution, you use context and the context is original public meaning. On the kind of history that we're looking for, I very much agree with Bruin that it's a how and a why. I don't think there's a ton of fight here about the why about taking on unusually dangerous items. I think the other side mostly fights about the how here. I do think the how can look at the ways in which the burden happens, not just the degree of burden. I think most of the circuits have been willing to do that. It's just that Rahimi makes really clear, we're not looking for a perfect one-to-one fit. So you can have a possession restriction on individuals who commit or are found to present a danger based on domestic violence based on surety laws and going armed laws. And so we do have historical tradition that involves bans involving the Bowie knife in 1837. My friends on the other side agree it was a ban in Georgia. We have sale bans. We have usurious taxes that would be $7,000 and $3,500 in modern era on these items. And then we also have a wide range of policy responses in the 19th century on both slung shots and Bowie knives that are sometimes possession, sometimes sale, sometimes manufacture, sometimes tax, sometimes carry. And all of that, a much tighter fit than Rahimi had between surety and going arms and the possession restriction that we see in modern times, a much tighter fit. And that kind of history gets us across the line regardless of the common use question. That was the second circuit's basic point. Can I ask a question geared at burden of proof on uncommon use? So when I typically think of, at least in a post-Glucksberg world, when I typically think of history as a way of identifying new rights, liberty interests that are deeply embedded in our history and tradition. In the Second Amendment space, it feels that history and tradition, and for that, the person seeking to establish a new right, bears the burden of showing that something's deeply embedded in our history and tradition. In the Second Amendment context, though, history and tradition almost flips because it's no longer a way of proving that people have a Second Amendment right. It's now proving that there's a regulated basis for limiting the Second Amendment, or basis in the history and tradition for limiting the Second Amendment right. So with that flip in the role that history and tradition plays, not as rights identification, but as rights limiting, doesn't that also flip the burden onto the state to show that, yes, there is a history and tradition of limiting this? And do you think that the state of New Jersey bears that burden, and have they met it here? I promise this isn't a cop-out. I'm going to say yes and no, but let me explain both the answers. So the half that I disagree with you on, just to start, I do think there's an originalist question about what the right to arms included. And if you look at Bruin at page 32, it notes three threshold inquiries. Are you the people? Is bearing for public part of the right? And are the arms in common use? Those are the arms that fall within the scope of the right itself. So sort of sets that up as the three threshold questions to ask. And then that's how you decide if you're in the right, which would be on their burden to get in the right. And then I completely agree with you. For history and tradition of regulations, and whether regulations are nevertheless acceptable, if that's rights limiting in your framing, then yes, we would bear the burden there. So I absolutely think that we bear the burden on showing that we can restrict unusually dangerous items, and that these items are unusually dangerous. We just quibble on common use. But as the Second Circuit said, it doesn't really matter what exactly common use means. And it doesn't really matter if it's the first step or the second step, so long as it's not the exclusive way to think about constitutional law in the Second Amendment, which I don't think it is given the historical record. And then we bear the burden. We've introduced a separate tradition around unusually dangerous, based on dangerous or unusual, based on English law, based on Bowie and Ives, based on the logic and common sense that the panthers and NAGR point to. And because of all that taken together, we have squarely met our burden about the historical regulatory tradition. It almost seems from both arguments here that it really just comes down to whose burden it is. And so whether that this first question or later, do you agree with that? I actually totally disagree with that, with apologies. I don't think the burden matters almost at all to this case, because I think we're actually talking past each other because we have a legal dispute. And the legal question on what the way to think about the legal test is, is the kind of question that appellate courts decide all the time without worrying about who bears the factual burden. So we think there is a fight about whether or not this test reduces to numbers, to a popularity test, or whether or not there's a separate historical tradition that is relating to restrictions on unusually dangerous items. If there is a separate historical tradition, we have put in a lot of evidence that goes to how we're able to do that. And we've put in a lot of evidence about the unusual danger posed by the AR-15 and the LCMs. If they're right, that it is just a then they have put in a bunch of evidence that a lot of people own the AR-15, and a lot of people own large capacity magazines, and a lot of people own machine guns, and a lot of people own bump stocks. And so I just vigorously resist their legal framework, because I don't think it works. They're saying that there are large numbers, and also that they've offered evidence that the people who have them subjectively want them for self-defense. I don't read it as a straight numerical argument, and perhaps Ms. Murphy will address it on rebuttal, but it seems like it's both quantitative plus the subjective intent of the person bearing the arm, and that they've offered evidence of that. So a couple of thoughts on that. I'm not sure subjective preferences really is a thing that exists in the ether in that way. Our subjective preferences, what we want to use for self-defense, is of course shaped by what's legally available. People don't want to use machine guns for self-defense, because machine guns haven't been available for self-defense since certainly 1986, and probably since 1934, given the pretty extreme measures that the National Firearms Act had imposed even at that time. Bump stocks on the other hand, and their prevalence today, suggest there are a lot of people who still want access to automatic fire. And unless my friends on the other side want to say about half a million Americans are trying to get bump stocks only for unlawful purposes, as opposed to for subjectively lawful purposes, then I don't think subjective preferences thing really gets them there either. We are looking instead from our test at the objective features of the item, and then at step one, comparing it to common real-world episodes of self-defense. So if it was true that people were regularly needing to shoot 15 bullets in self-defense, you could quickly see how an LCM might end up being in common use for self-defense based on its objective features. But of course the record shows the average is 2.2, 97.3 percent. So I understand, you're saying, you're acknowledging that they are arguing for a subjective component, you're just saying it should not be part of the test. It should be part of it. It's certainly better than a numbers only test is a numbers plus subjective test, but I don't think a numbers plus subjective test is legally relevant or historically grounded. I don't see anything in the history of the 1800s in which any of the courts that we're talking about, whether it's Huntley, whether it's Nunn, whether it's IMET, whether it's Cochran, are going through in those cases and well, these things got popular. And I bet they got popular because people like them. We're not doing a subjective preferences thing at all. We're looking at the objective features of the item and whether they pose unusual danger. Like the people of legislatures for hundreds of years were doing in England based on the interim effect to the broader population through the treatises like Blackstone that get relied on by the U.S. Supreme Court, through the Bowie knives, through the slingshot restrictions, through machine gun restrictions. It's never been subjective preferences. Counsel, I feel like when we're looking at the history and tradition, sometimes your test and argument is sort of shifting the factors that we look at. And because there's a history and tradition of regulating one aspect, now all of a sudden you went on everything. I mean, if the question is really that there's a presumption that once it's bearing arms, it's protected. And then we're looking at the burden that's on the right. Don't you have to show a history and tradition of there being such a severe burden, in which case, of course, subjective preferences and popularity and all of those factors would come in and you'd have to show they were not relevant to the analysis. So I'm not sure that's exactly right. I could use the Bowie knife example again. We put in record evidence, undisputed, there was a craze for Bowie knives, but there was a ban on the Bowie knife. No, it left a lot of other knives available. It left a lot of other arms available, just as modern 21st century laws do. That wasn't the end all be all at the time. And so Georgia had the ban. Tennessee had the manufacturer ban. I think it was Alabama had the $100 tax. Florida had the $200 tax. Those are thousands of dollars in the modern era. And so it's true. Plenty of states didn't ban. Our submission today is not that every state needs to ban the AR-15 or needs to ban the large capacity magazine. It's instead that there's always been policy variation. And on the table has been carrier restrictions, intent restrictions, possession restrictions, manufacturer restrictions, significant taxes. And that policy variation, sort of small democracy and federalism has played a role in the 1800s, just as it plays a role today. And so that's our only submission about what the history shows. It's not that every single state needed to pick the exact same kind of restriction. And if that way of thinking were right, Judge Mastodt, Rahimi would have to be wrong because the severity of the restriction from a going armed restriction and the severity of a restriction from a surety, where all you have to do is post a bond and then you can continue carrying the weapon, looks really different than the way that federal law dispossesses people from there's been a domestic violence danger finding. I guess I was meaning to push back though on your, what I took to be broad statement that subjective preferences generally are irrelevant. I just don't see any evidence. I'm so sorry, Judge Mastodt. No, I just don't see from the case law. So I don't, I agree. I don't see it in the case law. I don't see anything about subjective preferences in the case law and normally... I see that they're irrelevant. Well, they'd never come up in any directions. No one's asking about them. No one's looking at them. No treatise is saying that they matter. No case is saying that they matter. It would be quite a surprise if these were like secretly the way that we do this constitutional test. If this isn't something that legislatures are ever talking about, state courts in the 1800s are ever talking about, Blackstone's not talking about. I guess I'm making the point that it's relevant to the idea of the severity of the burden on the right. And so whether that particular phrase terminology shows us in Blackstone or not, it doesn't mean that the principle of the concept wouldn't still be relevant and you'd have to overcome it. But then I do think it's irreconcilable with things like Blackstone, which say things like dangerous or unusual is irreconcilable with the statute of Northampton, which isn't all about subjective preferences. Same with the Bowie knife example. It isn't asking what is your subjective preference? Are you going to participate in this duel or are you just part of the overall craze? And you like the idea of a longer blade and you like the cross guards that protect your hand and you like that it's better for cutting and stabbing because that's useful for self-defense as well. It's not asking what your subjective preferences were or aggregating them because it's never been part of our constitutional tradition. And I think it would run right into the teeth of the bump stocks example we're talking about, 520,000 as of 2018. I'm sure it's ironed out. It's the last ATF statistics we have from Cargill, plus subjective preferences, plus the fact they're generally legal in state laws. I just don't really see how to make a constitutional test out of that. Certainly the only historical test my friends have, only support there for their test, is this and unusual phrase, which as the second circuit points out was mostly an or unusual phrase and is chock full of other historical evidence that suggests that that's not really the way we do the right. You know, like I think aren't all firearms dangerous? Yes. And so if they're all dangerous and it's a dangerous or unusual test, then it feels that states can regulate any firearm that's dangerous. If they're all dangerous, then states can regulate all firearms. And then what's left of the second amendment? I completely agree with you, which is why this is so helpful for me. This is a critical point that Hanson rests on in the second circuit rests on. It can't be dangerous or unusual versus dangerous and unusual because neither has coherence. So dangerous or unusual. It's unusually dangerous. Exactly. And I really don't know how to say it either, honestly. I even chatted with you. So if it's unusually dangerous and it's objective, your focus in your briefing about the AR-15 is its lethality. And I'm not sure I get that because handguns are lethal. Handguns kill a lot more people every year in the country than AR-15s by a long shot. So help me with that. It's about disproportionate lethality, just like the Bowie knife. There was no evidence that the Bowie knife was responsible for the of deaths in the country in the 1800s, but it was disproportionately contributing to the public safety problem around dueling that was made famous by Bowie himself. But those numbers don't add up. I mean, handguns are wildly more disproportionately contributing to crime in America than AR-15. I think not disproportionately. I think that's doing important work here because handguns are obviously the dominant part of the market. We have statistics in this record showing that assault weapons are about three to 5% of the civilian market, but are about 25% of mass shootings. I know my friends... Mass shootings is a subset that does a tremendous amount of work there. I mean, look, airplane crashes, right? In terms of mass casualties are a lot worse than automobiles, right? But you'd agree that you're far more likely to get killed in a car crash than an airplane crash, right? I agree with that. So should we be more worried about cars or airplanes? I'm more nervous on an airplane, but I suspect that's not the objective direction, sir. Good. I want to honor your subjective fear, but is it possible that your subjective fear is objectively irrational? So I think that's possible. I'm not really hunting for the subjective preferences in either direction. In this case, I'm talking about the objective uses we see for these items. So if you look at the features of the AR-15, and again, but for automatic fire, it's the same features as the M-16 that we all agree can be restricted. And when you look at those features and you see that one of their clear features based on muzzle velocity is the over-penetration through walls, which makes them horribly ill-suited for self-defense in the home and certainly in apartment buildings. And then when you see that one of their special gifts is the ability to shoot 500 yards away, again, not useful for self-defense in New Jersey because it's only for use in the home because we're a concealed carry state, so you can't be using them in public anyway. So you don't really have 500 yard shootouts unless you are looking to use them in offensive ways. And I don't mean offensive like offends me, I mean offensive as opposed to defensive. Then when you look at the actual objective evidence of the AR-15, you see the way they lend themselves to disproportionate role in mass shootings, just like large capacity magazines. Right. But if we were to grant that the AR-15 is more effective as a self-defense weapon in a very rural area rather than a very urban area, that seems consistent with what you were saying about penetrating walls, etc. Does that then devolve into your argument being that the Second Amendment is different for people depending on whether they're rural, urban, suburban? I don't think so. So I think we're sort of like smushing together the two different steps in the way that New Jersey has articulated it. One step, which is about common use for self-defense, it's actual suitability for self-defense based on objective features, is our view of the first step and how we liquidate the common use tradition at the first step based on what Bruin said at 32. We think there is a separate legal tradition around unusual danger. So regardless of whether it has utility in self-defense, this is what the Second Circuit says most clearly just a month ago, regardless of utility for self-defense in those sort of common examples, maybe in a rural home if you live alone and no one else is in any of the other rooms, regardless of that, there is a way in which unusual danger has always stepped in. We think it's disproportionate contributions to public safety. The Bowie knife could have been used in self-defense. The M16 can be used in self-defense. If someone knew that you kept an M16 in your rural home, they might be quite nervous to attack you there, but we've always recognized that there's a certain kind of unusual danger that the item can have inherent to its features that even if it can be used in self-defense and we can speculate in self-defense where it gets used, it runs into the teeth of our separate historical tradition. And that gets back to Judge Kitt's question, which I'm not sure I really gave you yet a satisfying answer to, which is that I don't want a dangerous or unusual test, even though it's all over the treatises, because I agree with you. Everything is dangerous in that sense, but then dangerous and unusual doesn't make a lot of sense either, because then what you could have is New Jersey tomorrow could ban all new models of any gun or any gun that is not yet circulated to 30,000 numbers. Just pick a number for now. No new gun technology, stop at 30,000. That obviously can't be right. We don't think that makes any sense because we think dangerousness is not a standing alone. We think it's unusual danger. And my friends have to agree because my friends say we couldn't have that kind of law, but it would work on a dangerous and unusual test. It would be dangerous because it's a gun and it's dangerous. And it would be unusual because it doesn't exist yet. It hasn't circulated yet. So we could freeze all gun technology on that test. So the move my friends on the other side have made at the panel stage and in their briefing, and I suspect we'll have to make again today, is that they basically say it's unusual danger and unusual. Mr. Feigenbaum, I'd like to ask you, and I'd also like to hear what Ms. Murphy has to say in her rebuttal about this. You're using the 20th century meaning of unusual, but you know, cruel and unusual punishment. The original research is in the 18th century, unusual meant contrary to long usage. A punishment that had fallen out of use had become unusual, you know, flogging or branding or something like that. But in that sense, that would seem to suggest that unusual might be okay, the launch gays, or Ms. Murphy mentioned the blunderbusses, et cetera. But this is not a weapon that's fallen out of use. This is a weapon that's shown great popularity. So if we follow the 18th century meaning of unusual, do you lose? If I could answer that. So I don't think we lose, obviously, for two reasons. First, I don't think that's quite right. If you look at Huntley from the 1800s, it's one of the state high court cases that the parties talk about. It says that an item can be unusual, even though there's not scarcely a man who doesn't own it. So we know that we're not talking about something that has to have fallen into disuse or anything like that, that has kind of moved on from society. So I don't think that that fits actually the historical record in the context of talking about arms. And then I don't understand what we would have been talking about at the founding with the many treatises that say dangerous or unusual as well as dangerous and unusual, if it doesn't mean something about the exceptional lethality. And that's how the second circuit distills the tradition. That's how the DC circuit distills the tradition from doing the hard work that Bruin calls on and Rahimi confirms of looking through the history and identifying the principles. And so it's not just the word standing alone. I think they're quite helpful, but it's also what we see from the statute of Northampton. It's also what we see from launch gays and crossbows. It's also what we see from Bowie knives. It's also what we see from slung shots on through 20th century machine guns, confirming not creating the historical principle. Can you confirm that what we are talking about today is a ban and New Jersey concedes that not a license and registration scheme? Yeah. So we don't think of it as a licensing registration scheme on your question about the target shooting. That was a grandfathering clause. I understand my friends on the other side are representing clients who don't have grandfathered weapons. And so they wouldn't be using the weapons for target shooting. So I think for their standing, I think it would be not a grandfathering scheme from the 1990 law. I will say this gets into a couple of questions that I think you and maybe also judge ships and definitely also judge Bubas asked about the facial challenge nature. This is a sort of weird facial challenge, obviously, because it's not really to everything. It's not to every level of magazine capacity. It's not actually to everything in the assault weapons list. They say it's not to bump stocks. They say it's not to grenade launchers. It can't be to the striker 12 sweet street sweeper, because that's an ATF destructive device banned in 1994 that they're not challenging separately. And so but they don't carve that out. So we know it's not truly a facial challenge. So we're all trying to figure out like what's in or out of this case. And as a matter of civil procedure, it's definitely plaintiff's burden to make very clear if it's not a facial challenge, what exactly they are or aren't challenging. That's not a question of legal burdens on the test. It's the duty that plaintiffs have to actually is and isn't. Well, I actually had a question for you talking about usefulness and self-defense. I read over Justice Thomas's dissent from Saoirse Rory and Snope, which of course is binding on us. But he points out our Constitution allows the American people, not the government, to decide which weapons are useful for self-defense. We've never relied on our own of how useful an arm is for self-defense before deeming it protected. What's your reaction? Three reactions. One, it's not binding. Two, I would hug instead, I think, the Rahimi majority opinion and Justice Barrett's concurring opinion in Rahimi, which talk about how what we're really doing here is a serious historical analysis where we try to figure out what are the underlying historical principles and at what level of generality we want to use them. And then third, I just think it's a misunderstanding of how this law has always worked. It has always been the people through their elected representatives that have had some firearms regulation. It's never been prohibitive of the vast majority of available firearms in the country. And it isn't say by the people of New Jersey or the people of Delaware or what have you. And so just as the people in the 1800s through their elected legislatures chose to take on Bowie knives or slingshots and the special public safety problems they were presenting. So to the people today in two of the three states in the third circuit are able to have the same kind of policy responses with that historical tradition. Okay. Judge Smith, do you have anything? Again, no thank you. Okay. Thank you. We thank you for your argument. Thank you. Ms. Murphy. So I'd like to pick up where your question left off, which is the argument I seem to have heard from the state today is it simply doesn't matter if many, many people in America have decided that these weapons are suitable for self-defense. If they do in fact, if tens of millions of people do in fact choose to keep and bear these particular arms for self-defense, that simply doesn't matter. It is irrelevant. New Jersey can come in and say, you have all made a bad decision. I do not think that is consistent with the historical understanding of the second amendment with any of the history that the state is pointing to, and certainly not with the Supreme Court's decisions in Bruin and Heller and Rahimi. To pick up on the question that you asked Judge Beavis, the state, they use this concept of unusually dangerous repeatedly. I don't think that really helps them. We don't mind unusually dangerous if you understand that it has to mean unusually dangerous as to what? It has to be unusually dangerous as to something. And what historical tradition teaches is it's unusually dangerous as compared to the things that people commonly do use for self-defense, for lawful purposes. And that's why the Supreme Court was able to say in Heller and again in Bruin, that it drew from the dangerous and unusual tradition, the principle that arms that are in common use today for lawful purposes are necessarily not going to be dangerous and unusual because they're not dangerous in a way that differentiates them from the types of are commonly used. So I don't think that really, you know, at the end of the day, this debate about an and and or should you understand it as a whatever the word I can't pronounce either is, gets you very far because it has to be unusually dangerous in a way that actually means different from what is not unusual. And we think that's the real key here and where several courts have gone astray in saying, no, no, the state can just kind of decide that something is too dangerous on a metric that has nothing to do with commonality. I don't think that finds any support in the history because when you look at the history, you just don't see the types of prohibitions that we have here, sweeping bans. And I point you in particular, you heard a lot of discussion about Bowie knife. I would encourage you to look at the state's experts exhibit H about Bowie knife, which you can find at page, I think it's 560 of the record. The first thing that may there's not even a column for possession bans. Their expert couldn't even come up with a single law that he was willing to say was a possession ban. The vast, vast majority of them are concealed carry restrictions. Even the ones that he tries to kind of generically lump into carry are actually concealed carry restrictions. That's about the manner of carry. Others are things like enhanced penalties if you misused it, if you were carrying with intent to injure someone. So even as to the that they are trying to single out as this great example of how historically the government could just decide something people wanted was too dangerous. The record doesn't bear that out. There were not the kind of prohibitions they're talking about. The couple of laws that seem to go further were things like the same law in Georgia that was held unconstitutional in none to the extent it could have been read to prohibit carrying entirely. And so there just isn't when you can look more broadly at the Sloan shots and the clubs and what have you. The almost only laws that ever were anything that was actually a possession ban were race-based laws that would be unconstitutional for other reasons today. Most of those likewise are concealed carry restrictions and Bruin specifically said that concealed carry restrictions didn't even support bans on carry. So I don't see how they can suffice to support bans on possession if you take seriously that you have to focus on the how not just the why. The final thing I would say is much of the state's argument seems to turn on the notion that if you accept our position there's no way to conclude that machine gun bans could be constitutional. I just don't think that's right. First all you really have to say for purposes of this case is whatever the number is certainly when something is owned in the millions we can leave for another day how much lower we want to go. That said even as to the number of machine guns that ATF has most recently said are appear to be registered lawfully and available for lawful transfer ATF made a point of saying we have no idea how many of those are even functional firearms. There's nothing and no state seems to want to make the record on why they are used and that's important because it absolutely is argued that it matters not just how many people own them but what they own them for. If you own them simply as a collector's item that doesn't even function that's going to matter when you do the analysis because how are said it has to be that you own them for lawful purposes. You're keeping them bearing them with the intent to use them in a particular manner that the second amendment contemplates. What do you say to Mr. Feigenbaum's point about 520,000 bump stocks? Sure again we just don't really have any record about the particular ownership of those and I think you know we're not here challenging that. I think you can leave for another day somebody makes a record about who owns these why do they own these what do they do with them and ask those questions. They matter they should be analyzed in a case-by-case basis. You shouldn't decide cases that have nothing to do with bump stocks and machine guns based on assumptions about the people who own them when the state could have tried to make actual records about that and chose not to do so. Following up on that Judge Beavis's question earlier about the spatial challenge to magazines the complaint doesn't carve bump stocks so is the application of the LCM ban to a bump stock constitutional? So we're not challenging it I think that actually comes into the assault firearms ban but we're not challenging the application of the law vis-a-vis bump stocks so we're not in your complaint your complaint just says it's a facial challenge. I'm not I can't standing here recall precisely what the relief is that we asked for in terms of which provisions we asked to be enjoined but I can tell you we're perfectly happy for that to be carved out it's not something we've ever focused on as something that we're challenging. Just so I understand you are saying that would be a constitutional application? We're not challenging it we're not challenging it so we are challenged in your complaint. I understand you're saying you can't recall. We are not challenging it if it was in the complaint I can stand here and tell you on behalf of my clients we are not challenging the application to bump stocks but I want to be clear I mean a bump stock is not an ammunition feeding device it's not a magazine it's not part of the magazine ban. Talking about a constitutional application of things and so if so if you're saying that it's not and you're disavowing that this is more like an as applied to everything but the bump stock for the LCMs. The way I mean New Jersey's law operates a little bit of a funky way because they kind of list firearms without them then identify the features like separately in their guidelines about it but we are challenging the definition as it applies you know to the firearms themselves and that's just not one of the components that we have focused on. Our focus is on the as New Jersey has explained it that they are focused on firearms that have things like a pistol grip a detachable holding stock just just simply a detachable magazine. We are not focused on bump stocks here and we would have no problem with this court saying you know to the extent that the aspect of the law as to bump stocks just wasn't at issue here and it's not something that your decision. And I'm just trying to understand because it matters for if it's an as applied or facial it sounds like substantively really if we were just to treat it substantively you're saying it's more like an as applied because you're carving out any applications to bump stocks. I mean we're challenging specific provisions and we're not challenging the provision that addresses bump stocks so you could think of that as an as limited facial challenge that applies to the provisions that don't address it. So but I think again that's well you know I don't think that does any work on the magazine side. I think it only does work in terms of the scope of the assault firearms that are that are covered by the ban. We're not you know we aren't challenging literally everything that New Jersey has banned. On common use your friend referred to a numbers only test which she appropriate numbers plus subjective test probably inappropriate. It might be helpful for us if you would just describe sort of in a shorthand way what is how do you see your test? Sure I mean I think you should I think numbers are relevant. I think numbers in an absolute sense in a relative sense are relevant. I also think as Mr. Patterson was discussing that it's relevant that you have something you can look at the historical tradition of how a particular type of arm has been treated. If I mean semi-automatic this case is about semi-automatic firearms. It may be about a subset of them but it's about semi-automatic firearms and it's barely even a subset when it comes to rifles and we're talking about rifles that have been available. The rifles with the features here have been available for well over a century and we have a century that tells us that these have not been treated by the country you know and in stark contrast with the way fully automatic weapons were immediately when they came on the market. These have a long tradition. I think you can look at that tradition. You can look at are they widely legal throughout the country today? Are they widely chosen by people for lawful purposes? I don't think you have to make it all about simply numbers. I think you can take all of that into account in answering the ultimate inquiry of are these the types of things that ordinary people commonly choose typically choose for lawful purposes. As I understand the test from your friend on the other side, he also mentioned you mentioned widely chosen for lawful purposes. He mentioned actually useful for lawful purposes or whether or not it has disproportionate lethality. Can you respond to that? Sure. So what I understand the states you really want to focus on is let's just look at the subset of universities, the subset of instances where people face an attacker and what do they do in that I don't think that comports with the text, with the historical tradition or with the precedent because the text of the second amendment, it doesn't protect a right to self-defense simpliciter. That exists independent of the second amendment. The second amendment protects the right to keep and bear arms to have at the ready to use in self-defense situations. So we think the universe of relevant conduct is how people keep and bear arms. Do they keep them for lawful purposes? Do they use them for lawful purposes? And I use an arm for a lawful purpose when I carry it to be ready for confrontation, not just when I fire it at somebody who is attacking me. And so I think the state is really carving out this extremely narrow subset of use that isn't consistent with the text and isn't consistent with Heller and Bruin since what they focused on in discussing common use is whether it's typically possessed by a law-abiding citizen as opposed to highly unusual in society at large. That's clearly focusing on are there a lot of them that people are using for lawful purposes, not they never even talked about how often do people choose to use the handgun versus the rifle versus the shotgun when an attacker is showing up at their house. So assume I agree with you that you know it's not about whether or not you use it when an attacker shows up. Do we consider the objective features of the weapon and its ability to be used for the stated lawful purpose? I think you consider them vis-a-vis a historical and a common use analysis, not in some independent way where it's this court's job to assess in the abstract whether you think a particular firearm is well suited for self-defense. You look to the people who have had a chance to make that decision when it comes to these types of arms. For a century they have made the decision that these are well suited. Contrast that with and you know there was a great deal of discussion about machine guns. The people have not made that decision as to automatic weapons. They instead made a very different decision. Automatic weapons came on the market in the early 1920s. Within five years more than half the states had banned or severely restricted them. Nobody's ever made a serious move to change the law. I think you can look at that historical tradition to see that the people have made a judgment that automatic technology is different and that they don't find it particularly useful for self-defense because people don't want arms that are less likely to be accurate. They don't want to hurt their loved ones and destroy their property. They want to neutralize the attack in as few and as accurate of rounds as possible, which is why this law is particularly perverse since the features New Jersey has singled out are by its own admission features that just help ensure that you're as likely to have an accurate uh you know fire accurately the first time as you are the second, third, fourth, fifth time, which many people are going to need to do in an actual self-defense situation. So no further questions. Thank you very much. Judge Smith. Apologies. Uh no, just thank you for allowing me to participate remotely. I think. Thank you. Glad to have you. Uh thank you counsel for your excellent briefing and argument. We'll take the case out of advisement and ask the clerk to adjourn court for the day.